# Supreme Court of Louisiana

The Opinions handed down on the **27th day of June, 2018**, are as follows:

**BY WEIMER, J.**:

2017-CJ-1988     IN RE: L.M.M., JR., A MINOR (Parish of Jefferson)
                 In this action, the biological mother of a child placed under
                 guardianship with the child's paternal great-aunt filed a
                 petition to terminate that guardianship and to regain custody of
                 the child.  Following a trial conducted over three days, the
                 district court rendered judgment terminating the guardianship and
                 awarding joint custody of the child to the guardian and the
                 biological mother, with the mother designated as the domiciliary
                 custodian.  On appeal, the court of appeal reversed the district
                 court judgment, reinstated the guardianship, and remanded the
                 case to the district court for purposes of establishing a
                 visitation schedule for the mother.  At the mother's behest, we
                 granted certiorari to assess whether the correct legal standards
                 were applied by the courts below and to review the correctness of
                 the district court's determination that the guardianship should
                 be terminated. Finding that this case highlights the distinction
                 that exists between custody determinations under the Civil Code
                 and the guardianship provisions of the Children's Code, we hold
                 that the proper standard for determining whether an order of
                 guardianship should be modified or terminated is statutorily
                 prescribed by Article 724 of the Children's Code, which, in this
                 case, requires proof by the movant/mother by "clear and
                 convincing evidence" of "a substantial and material change in the
                 circumstances of the guardian or child" because either
                 "[c]ontinuation of the guardianship is so deleterious to the
                 child as to justify a modification or termination of the
                 relationship" or "the harm likely to be caused from a change in
                 the guardianship is substantially outweighed by the advantages to
                 the child of the modification." La. Ch.C. art. 724(D).  Weighing
                 the evidence in light of that evidentiary burden, we agree with
                 the court of appeal's assessment that the district court erred in
                 determining that the mother met her burden of proving the
                 guardianship should be terminated.  Therefore, we affirm the
                 judgment of the court of appeal reinstating the guardianship
                 order.

                 AFFIRMED AND REMANDED.

                 HUGHES, J., dissents and assigns reasons.

SUPREME COURT OF LOUISIANA

No. 2017-CJ-1988

IN RE: L.M.M., JR., A MINOR

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,*
*FIFTH CIRCUIT, PARISH OF JEFFERSON*

**WEIMER, Justice**

In this action, the biological mother of a child placed under guardianship with the child's paternal great-aunt filed a petition to terminate that guardianship and to regain custody of the child. Following a trial conducted over three days, the district court rendered judgment terminating the guardianship and awarding joint custody of the child to the guardian and the biological mother, with the mother designated as the domiciliary custodian. On appeal, the court of appeal reversed the district court judgment, reinstated the guardianship, and remanded the case to the district court for purposes of establishing a visitation schedule for the mother. At the mother's behest, we granted certiorari to assess whether the correct legal standards were applied by the courts below and to review the correctness of the district court's determination that the guardianship should be terminated.

Finding that this case highlights the distinction that exists between custody determinations under the Civil Code and the guardianship provisions of the Children's Code, we hold that the proper standard for determining whether an order of guardianship should be modified or terminated is statutorily prescribed by Article

724 of the Children's Code, which, in this case, requires proof by the movant/mother by "clear and convincing evidence" of "a substantial and material change in the circumstances of the guardian or child" because either "[c]ontinuation of the guardianship is so deleterious to the child as to justify a modification or termination of the relationship" or "the harm likely to be caused from a change in the guardianship is substantially outweighed by the advantages to the child of the modification." La. Ch.C. art. 724(D). Weighing the evidence in light of that evidentiary burden, we agree with the court of appeal's assessment that the district court erred in determining that the mother met her burden of proving the guardianship should be terminated. Therefore, we affirm the judgment of the court of appeal reinstating the guardianship order.

## FACTS AND PROCEDURAL HISTORY

L.M.M. was born prematurely[1] on November 16, 2011, to 18-year-old Kodie Servat ("Kodie") and 19-year-old Lane Mouney, Sr. ("Lane"). The biological parents were unmarried and needed assistance caring for the child. As a result, upon his release from the hospital, the child lived on an alternating weekly basis at the homes of his maternal grandmother, Denise Roques ("Denise"), and his paternal great-aunt, Lisa Mouney ("Lisa"). While Lane lived primarily with Lisa, Kodie would alternate between homes, depending on which home the child was living in at the time.

As both Kodie and Lane candidly acknowledged, the couple routinely used illicit drugs, including synthetic marijuana, after L.M.M. was born. Denise confirmed that the couple "started messing up," getting high on synthetic drugs. According to Denise, all Kodie was worried about at the time was Lane. She and Lisa cared for L.M.M. while Kodie and Lane were "out doing their thing." Lisa testified that their

---

[1] According to evidence presented at trial, the child was born at 30 weeks gestation.

2

shared living arrangement became untenable when she suspected Kodie and Lane were stealing from her, so she asked them to leave. Kodie and Lane moved to Mississippi to live with Kodie's father, leaving the child in Louisiana. Denise and Lisa continued to care for the child on an alternating weekly basis for approximately nine months, until Denise brought L.M.M. to Kodie in Mississippi.

During their tenure in Mississippi, the couple came to the attention of the Mississippi Department of Human Services ("DHS"). At a surprise home visit on or about February 19, 2013, a DHS case worker observed Lane in open possession of a container of synthetic marijuana. Kodie and Lane were subsequently arrested for possession of synthetic cannabinoids, and L.M.M. was taken into the custody of the DHS and placed in foster care.

While in foster care, L.M.M. became ill, requiring hospitalization. The foster mother, who had expressed concerns that L.M.M. was developmentally delayed, indicated that she could no longer care for him. Lisa stepped in and, on March 20, 2013, filed a Petition for Appointment of Guardian in the Chancery Court of Jackson County, Mississippi. Attached to the petition were "Consent to Guardianship" documents executed by both Kodie and Lane. That same day, a Decree Appointing Guardian was signed by the court, appointing Lisa as guardian of L.M.M. on a finding that the guardianship was necessary because the child had been removed from the custody of his natural parents and that Lisa is a fit and proper person to serve as guardian. Legal and physical custody of the child was released by the DHS.

When Lisa assumed guardianship of then 15-month-old L.M.M., he had several problems, including recurring ear infections and the inability to walk. He was only able to "army crawl." On the advice of his doctor, Lisa arranged for L.M.M. to have tubes inserted in his ears and his adenoids removed. She re-established his

3

enrollment in Early Steps, a therapy program for premature infants who might be expected to experience developmental delays. Through Early Steps, Lisa was referred to Dr. Aaron Karlin, a pediatrician who specializes in physical medicine and rehabilitation. Dr. Karlin diagnosed L.M.M. with developmental delays and spastic hemiparetic cerebral palsy,[2] which is a lifelong condition requiring ongoing therapy. By the time of trial, through Lisa's efforts, L.M.M. had made significant progress. He was regularly attending physical and speech therapy, had been fitted with a boot to correct his dragging right foot, and was enrolled in gymnastics to help with his balance.

By all accounts, Kodie also made remarkable progress. After struggling with synthetic marijuana abuse for a brief period of time, Kodie ceased her drug use. While Lane drifted in and out of jail, Kodie obtained employment, married, and established a stable home with a supportive family and religious community.

In light of these developments, on March 30, 2015, Kodie filed a Petition to Make Foreign Judgment Executory in the 24th Judicial District Court, seeking to have the Mississippi Decree Appointing Guardian made executory in Jefferson Parish. On March 31, 2015, the district court signed an order making the Mississippi decree "the Judgment of this Court."

Thereafter, on August 24, 2015, Kodie filed a Petition to Modify Custody and to Terminate Guardianship of Minor. In her petition, Kodie represented that circumstances have changed since Lisa was granted guardianship, warranting a change in custody and the return of L.M.M. to his mother. Specifically, Kodie alleged that she has remained drug-free for over a year, has maintained steady

---

[2] In L.M.M.'s case, the condition largely manifests itself as right-side weakness, with a tendency on the child's part to drag his right foot. Witnesses described his gait as a type of "duck walk."

4

employment, is now married and living in a stable environment, has no contact with L.M.M.'s father, who remains incarcerated, and has generally established a stable lifestyle, making her capable of parenting L.M.M and providing a wholesome environment for him. She averred that Lisa has refused to foster a good relationship between L.M.M. and herself and has restricted her contact with L.M.M. Furthermore, Kodie contended that any harm likely to be caused from a change in the guardianship is substantially outweighed by the advantages to the child of the modification sought.

Lisa answered the petition, generally denying the allegations of a change in circumstances and asserting that she should remain as sole guardian of the child. On December 9, 2015, the district court signed an order appointing Dr. Karen Van Beyer as a mental health expert to perform a custody evaluation. After Dr. Van Beyer completed her evaluation and issued her report, which recommended that joint custody be awarded to Kodie and Lisa with Kodie as domiciliary parent, the recommendation was made an interim order of the court. Both Kodie and Lisa objected to the interim order and requested a *de novo* hearing before the district court.

At Lisa's request, a second custody evaluator, Dr. A. James Klein, was appointed by the court. In the interim, Kodie filed a First Supplemental and Amending Petition to Modify Custody and to Terminate Guardianship, seeking, in the alternative, an order annulling the Decree Appointing Guardian for fraud and ill practices pursuant to La. C.C.P. art. 2004. Lisa answered the amended petition, denying the allegations and again asserting that she should remain as sole guardian of L.M.M.

Trial of this matter was conducted over three days in October and November, 2016. In addition to offering testimony from extended family members,[3] Kodie testified. She explained that after L.M.M.'s birth, he was moved to the neonatal intensive care unit of the hospital, where he remained for approximately two months. She testified that she visited L.M.M. at the hospital daily and that when he was released, L.M.M. was a healthy baby. Kodie denied using drugs while pregnant, although she admitted to smoking cigarettes. She confirmed that on his release from the hospital, L.M.M. spent alternating weeks at her mother's house and at Lisa's home, and that she would stay at Lisa's when L.M.M. was there. As a result of his prematurity, L.M.M. was enrolled in the Early Steps therapy program, but Kodie testified that she terminated L.M.M.'s participation in the program in July of 2012 because he was "caught up" and developing normally, "doing all that he should."

Kodie admitted that L.M.M. was removed from her custody and placed in state custody in Mississippi after drugs were found in the apartment she shared with Lane and L.M.M., and they were arrested. She testified that after L.M.M. was taken into state custody, she met with Child Services in Mississippi and understood that she could work towards regaining custody by submitting to drug tests, going to rehab, and taking parenting classes. She was never told by Mississippi authorities that her parental rights were about to be terminated.

Kodie acknowledged that L.M.M. became sick and was hospitalized while in foster care, but maintained that he was healthy and doing well when removed from her custody. She explained that she moved back to Louisiana in March of 2013. She admitted signing a "Consent to Guardianship" document on March 20, 2013,

---

[3] Kodie's mother, Denise, her mother-in-law, Robin Servat, and her husband, Benjamin Servat testified regarding Kodie's early struggles and her subsequent efforts at rehabilitation and towards establishing a safe and nurturing environment for L.M.M.

consenting to Lisa's appointment as guardian of L.M.M.; however, she maintained that nothing was read to her and she was just told where to sign. According to Kodie, it was her understanding that, if she agreed to the guardianship, she would be able to see L.M.M. whenever she wanted and that she would be involved in any medical decision-making concerning the child. She stated that she believed the guardianship was just a temporary situation until she and Lane could obtain stable employment and stay off of drugs. Nonetheless, she agreed that the guardianship order does not grant her visitation. She acknowledged that if Lisa had not been granted guardianship, L.M.M. would have remained in state custody until she and/or Lane complied with Mississippi's requirements to regain custody.

Kodie testified that after Lisa was granted guardianship of L.M.M., she was only allowed to see him four or five times from March 2013 through December 2013, although she asked to see him more often. In 2014, she was allowed to visit with L.M.M. for two hours every Monday.

Kodie complained that her suggestions for L.M.M.'s medical treatment would be ignored, and that she would be notified of his medical appointments too late to enable her to participate. She acknowledged that L.M.M. has some medical issues, but testified that she does not believe he has cerebral palsy. She explained that L.M.M. has some stiffness in the muscles of his right leg, but claims that this is the result of physical therapists being told he has right-side weakness and giving him exercises to strengthen his right side, which caused the muscles to tighten. She admitted L.M.M. speaks with a lisp and that she cannot always understand what he is saying, but she does not believe this is a problem for a child who gets excited and tries to talk too fast. Kodie acknowledged that one of L.M.M.'s foster parents in Mississippi expressed concern that L.M.M. was showing signs of developmental

7

delays, and that Dr. Karlin's records reflect a diagnosis of developmental delays and spastic hemiparetic cerebral palsy. However, she testified that she would like to obtain a second opinion because she believes Dr. Karlin's diagnosis was colored by the history reported by Lisa.

Ultimately, Kodie testified that she believes Lisa's care of L.M.M. benefitted her son at a time when she was not in a position to do what was best for him. However, she explained that since that time, she has remained drug-free and has found a good job, a good home, a family with her husband, Ben, a church family, good in-laws, and a strong support team who remind her that she is not the person she was three to four years ago. She testified that she believes that Lisa has played a very important role in L.M.M.'s life and that cutting Lisa out of L.M.M.'s life would not be in his best interest. She believes Lisa should remain in L.M.M.'s life, but as a great-aunt, and not as a mother-figure. Finally, she expressed concern about her ability to co-parent with Lisa, noting that when Lisa has control, she has a tendency to cut Kodie out.

Lisa also testified at trial. She explained that she has known Kodie since Kodie was about 13 years old and considered her a member of the family. Lisa confirmed that after L.M.M. was born, Kodie, Lane and L.M.M. lived at her house on alternating weeks, but that she eventually asked them to leave because she suspected they were stealing from her. Kodie and Lane moved to Mississippi and initially left L.M.M. with her and Denise. Shortly after Denise took L.M.M. to live with Kodie and Lane in Mississippi, the couple was arrested, and L.M.M. was placed in foster care. Lisa testified that while in foster care, L.M.M. fell ill and was hospitalized. The foster parents could not take care of him because he was so sick and he was about to be moved to another foster placement, so she contacted a Mississippi attorney. The

attorney prepared guardianship papers. Kodie and Lane each signed a document consenting to the guardianship. When asked "why guardianship," Lisa explained that she was being told that L.M.M. was "severely retarded" and needed medical attention, but that no one else would take him. She believed time was of the essence in getting L.M.M. the medical attention he required. Lisa denied speaking to Kodie about the guardianship, testifying that Kodie discussed it with Denise, Kodie's sister Alisha, and Lane. According to Lisa, her understanding of the guardianship was that she was to take L.M.M., protect him, and do everything she could to make him better and get him back to a normal life.

Lisa disputed Kodie's claim that she denied Kodie visitation with her son. Lisa testified that, to the contrary, there was never a time when she told Kodie she could not visit with L.M.M. Lisa did acknowledge that she told Kodie's family that L.M.M. could not spend the night with them if Kodie was present, but explained that this was because she took her responsibilities as guardian seriously and did not want harm to come to the child. She was concerned that, if anything should happen to L.M.M., it would be her fault. For that reason also she insisted that visitation be supervised, as she was concerned that Kodie could potentially put L.M.M. at risk.

Lisa testified that Kodie initially visited with L.M.M. one day a week. Visitation was later increased to two days a week, until Dr. Van Beyer's recommendation was made an interim order of the court. Lisa explained that she did not have a problem allowing Kodie to visit with L.M.M., but that Kodie was "in and out of his life" and that she sometimes did not hear much from Kodie. Moreover, there were times when L.M.M. would visit Kodie's family and Kodie did not go to see him.

Lisa testified that L.M.M.'s right side is weaker than his left, so he tends to hold up his right arm. She explained that he walks with a limp and drags his foot, so he wears a "boot" to try to correct the problem. Lisa stated that although she told Kodie several times that Dr. Karlin has diagnosed L.M.M. with hemiparesis or cerebral palsy, Kodie does not believe that L.M.M. has cerbral palsy or any disability. According to Lisa, the cerebral palsy has to be controlled with ongoing therapy and treatment; however, she believes that if he continues to receive the treatment he requires, L.M.M. will be able to have a stable adult life.

Lisa confirmed that she has consistently taken L.M.M. to physical therapy and to medical and dental appointments. She acknowledged that she informed L.M.M.'s doctors that Kodie may have been on drugs when L.M.M. was born, but explained that she did so because she believed it was a possibility and that the doctors needed to know all of the facts. Lisa enrolled L.M.M. in private daycare where the director reported that L.M.M. has developed and progressed physically, mentally and emotionally. She also enrolled him in gymnastics to help with his physical limitations. Lisa testified that Kodie has done nothing to assist her in helping L.M.M. with his disability. She explained that, except for a period of four to five months when L.M.M. was in Mississippi, he lived in her home and calls her home his home. Lisa testified that she has been a constant presence in L.M.M.'s life, helping to care for and financially support him even before she was granted guardianship. She testified that she would like to continue that guardianship and is more than willing to continue to help with L.M.M.'s medical needs. Lisa explained that she has provided L.M.M. with a stable environment in which he has thrived. She stated that she believes it is important for L.M.M. to have Kodie in his life and that having time with Kodie is not the problem. Her primary concern is with Kodie's willingness to keep

up with L.M.M.'s medical care. She fears that Kodie will not follow through and, thus, believes it is in L.M.M.'s best interest that she remain as guardian.

The two experts in child custody evaluations who were appointed by the court, Drs. Van Beyer and Klein, also testified. Dr. Van Beyer testified that, after Lisa assumed guardianship of L.M.M., it took Kodie a couple of months to get clean, but that by the time the child was about 18 months old, she had stopped using drugs. Dr. Van Beyer stated that she did not know of any reason why Kodie should not have been allowed to see L.M.M. She opined that Kodie appears to have very adequate parenting skills and an appropriate attitude insofar as setting consequences for the child. After meeting with Kodie and her husband, Ben, Dr. Van Beyer did not have any reservations about L.M.M. transitioning into Kodie's home.

Dr. Van Beyer testified that she interviewed Lisa during the evaluation process and did not feel that Lisa had overstated any of L.M.M.'s medical needs. She noted that L.M.M. was born prematurely and that Lisa was determined and avid in her pursuit of the medical attention he needed; so much so that by the time she saw L.M.M., he was no longer really behind. It was Dr. Van Beyer's understanding that Kodie was not notified and did not attend any medical or therapy appointments. Dr. Van Beyer felt that Lisa should have made every effort to include Kodie in L.M.M.'s everyday life, medical treatment, and psychotherapy. She recommended that Kodie and Lisa share joint custody of L.M.M. for a year with Kodie having domiciliary custody and that thereafter, if Lane proved unable to stay out of jail and drug free, Kodie should have sole custody.

Dr. Klein testified that he interviewed L.M.M. and that, while the child did not appear to be significantly disabled from a lay perspective, he did demonstrate a mild preference for one side and his language was not very clear. Dr. Klein stated that it

was very evident that L.M.M. has a positive, bonded attachment to both Lisa and Kodie. It was his clinical judgment that Kodie has turned her life around. He could find no negative markers in Kodie's ability to parent, and he ultimately recommended that Kodie and Lisa be granted joint custody of L.M.M. with Kodie as the domiciliary parent.

After hearing testimony from Lane, the district court took the matter under advisement.[4] On December 8, 2016, the court rendered judgment terminating the guardianship and awarding joint custody of L.M.M. to Kodie and Lisa, with Kodie designated as the domiciliary custodian.[5] In written reasons, the district court explained:

> The petition for appointment of guardian did not comply with La. Ch.C. art. 720(B) Motion for guardianship. The petition did not include a description of the mental and physical health of the child, addresses of the parents of the child and, most importantly, a plain and concise statement of the facts on which the motion for guardianship was sought and why neither adoption nor reunification with a parent is in the best interest of the child. In addition, it appears that the requirements of La. Ch.C. arts. 722(A)(2) and (C) were not met.
>
> Furthermore, according to testimony, the guardianship papers were provided to Kodie Servat and she was told to sign the papers or give up her child, [L.M.M.] for good. Kodie Servat testified that she thought she would have visitation and eventually have her child returned to her.

---

[4] Lane confirmed the events leading up to his arrest and the removal of L.M.M. to the custody of the state. He testified that Lisa came to have custody of L.M.M. because he and Kodie wanted someone in the family to have custody of the child and no one else would take him. Lane testified that he understood when he signed the guardianship documents that he was relinquishing his rights to his son until L.M.M. reached age 18, and that no one coerced or forced him to sign the consent to guardianship. He stated that he consented to the guardianship because he could not care for L.M.M. at the time and because it was in the child's best interest that Lisa be his guardian. While Lane testified that he does not have any concerns as far as Kodie and Ben's ability to parent L.M.M., he feels it is in the best interest of L.M.M. that Lisa be a part of his life today.

[5] The district court judgment additionally set forth a visitation schedule, appointed a parenting coordinator, made provisions for the child's therapy, set forth requirements for Kodie and Lisa to share medical, educational, and other information pertaining to L.M.M., and directed that Lane have only supervised visitation until such time as he provides proof that he has not engaged in criminal activity and has remained drug free for one year.

After review of the custody evaluation reports prepared by Dr. Karen Van Beyer and Dr. Alan James Klein, considering the best interest of the minor child, and considering that Kodie Servat has developed a stable lifestyle and is quite capable of caring for [L.M.M.], this Court is of the opinion that the guardianship of [L.M.M.] by Lisa Mouney shall be terminated.

Lisa appealed. In a unanimous decision, the court of appeal reversed the judgment of the district court, reinstated the guardianship, and remanded the case to the district court for purposes of establishing a visitation schedule for Kodie. **In re: L.M.M., Jr.**, 17-345 (La.App. 5 Cir. 10/25/17), 230 So.3d 301.

In rendering its decision, the court of appeal noted that modification or termination of a guardianship is governed by the provisions of the Children's Code and, in particular, La. Ch.C. art. 724. The court pointed out that pursuant to La. Ch.C. art. 724(D), a guardianship may be modified or terminated only if there is proof by clear and convincing evidence of a change in circumstances of either the guardian or the child under one of three situations: (1) the guardian no longer wishes to serve or can no longer serve as guardian; (2) the continuation of the guardianship is so deleterious to the child as to justify a modification or termination of the relationship; or (3) the harm likely to be caused from a change in the guardianship is substantially outweighed by the advantages to the child of the modification. **In re: L.M.M., Jr.**, 17-345 at 13, 230 So.3d at 309. Finding that the first two situations for demonstrating a change in circumstances of either the minor or the guardian have not been met, as the record reflects that Lisa wishes to continue as guardian and that the guardianship, far from being deleterious to L.M.M., has greatly benefitted him, the court went on to assess whether clear and convincing evidence was offered to prove a change in circumstances pursuant to the third situation; *i.e.*, the harm likely to be caused from a change in guardianship is substantially outweighed by the advantages

13

to the child of the modification. ***Id.***, 17-345 at 13-14, 230 So.3d at 309. Reviewing the evidence, the court of appeal concluded that while her drug rehabilitation is commendable, Kodie failed to prove that the advantages to L.M.M. gained from her self-improvements "substantially outweigh" the harm to L.M.M. from terminating the guardianship of someone who has become a "psychological parent" to the child and who has provided stability, consistency, and been diligent in obtaining the medical care and therapy he requires. ***Id.***, 17-345 at 14, 230 So.3d at 309-10.

In reaching its decision, the court of appeal rejected Kodie's contention and any suggestion in the district court's written reasons, that the guardianship order did not comply with the law and that it should be annulled due to fraud or ill practices. The court pointed out that it was Kodie who moved to have the guardianship order make executory and recognized as a valid judgment in Louisiana, and concluded that her failure to appeal the guardianship order precluded her from attacking the original guardianship order in this proceeding. ***Id.***, 17-345 at 15, 230 So.3d at 310 n.9.

Applying an abuse of discretion standard to the district court's factual determinations based on the custody evaluators' reports, the best interests of the child, and Kodie's self-improvements, the court of appeal ultimately concluded that the district court abused its discretion in finding that Kodie met her burden of proving the guardianship should be terminated. ***Id.***, 17-345 at 15, 230 So.3d at 310-11. The court reinstated the guardianship order and remanded the matter for the district court to set a visitation schedule for Kodie. ***Id.***

This court granted writs on Kodie's application to determine whether the court of appeal applied the correct legal standards in reviewing the district court judgment

14

terminating the guardianship.[6] **In re: L.M.M., Jr.**, 17-1988 (La. 2/9/18), 234 So.3d 888.

## LAW AND ANALYSIS

This case involves a guardianship, which is a relatively recent concept in Louisiana law. See 2011 La. Acts 128, § 1 (enacting guardianship); see also Official Comments to La. Ch.C. art. 718 (describing historical development of guardianship as a legally recognized relationship). While guardianship is a form of custody, it represents a markedly different form of custody from that delineated in the Civil Code articles addressing custody, La. C.C. arts. 131, *et seq*. Guardianship, under the Children's Code, is a custodial arrangement that is intended to be permanent. As explained in La. Ch.C. art. 718:

> A. The purpose of guardianship is to provide a permanent placement for children when neither reunification with a parent nor adoption has been found to be in their best interest; to encourage stability and permanence in the lives of children who have been adjudicated to be in need of care and have been removed from the custody of their parent; and to increase the opportunities for the prompt permanent placement of children, especially with relatives, without ongoing supervision by the department.

> B. This Chapter is intended to ensure that the fundamental needs of children are met and the constitutional rights of all parties are recognized and enforced.

The legislature has set forth stringent criteria for any change or modification to a guardianship. Pursuant to La. Ch.C. art. 724(D):

---

[6] In her writ application, Kodie does not challenge the validity of the guardianship order for formal defects or vices of consent. The only issue raised in her application is whether the district court properly terminated the guardianship in accordance with the provisions of La. Ch.C. art. 724. Therefore, any claim of formal defects in the guardianship order is not properly before this court. See, **Boudreaux v. State, Dept. of Transportation and Development**, 01-1329, p. 5 (La. 2/26/02), 815 So.2d 7, 11 (questions not contained in the original writ application are not properly before us).

A guardianship order may be modified or terminated if the court finds by clear and convincing evidence that there has been a substantial and material change in the circumstances of the guardian or child because of any of the following:

(1) The guardian no longer wishes to serve or can no longer serve as guardian of the child.

(2) Continuation of the guardianship is so deleterious to the child as to justify a modification or termination of the relationship or the harm likely to be caused from a change in the guardianship is substantially outweighed by the advantages to the child of the modification.

Before this court, Kodie concedes that her petition seeking to terminate Lisa's guardianship is governed by the criteria set forth in La Ch.C. art. 724(D). However, she argues that the statutory criteria, as set forth and applied by the court of appeal, conflict with and undermine the overriding consideration in all custody disputes: the best interest of the child. According to Kodie, by requiring evidence of a substantial and material change in the circumstances of the guardian or the child as a predicate to terminating the guardianship, the statutory criteria thwart, rather than promote, the best interest of the child. Kodie argues that the situation in this case is akin to that addressed in **Tracie F. v. Francisco D.**, 15-1812 (La. 3/15/16), 188 So.3d 231, wherein, in a dispute between two parties with shared custody arising from a consent decree, this court rejected a standard for showing a material change in circumstances that would have required a rehabilitated father to prove not only his rehabilitation, but also a material change in the stable environment in which the child was placed in order to expand his custodial rights. In **Tracie F.**, this court noted that under the factual scenario presented–a stipulated custody award–the heightened standard applied by the court of appeal to obtain a change in custody thwarted, rather than promoted the best interest of the child because, "if the non-parent's custodial environment remains stable, ... a court will never question whether a change to

16

parental custody would be in the child's best interest." **Tracie F.**, 15-1812 at 13, 188 So.3d at 241. Kodie argues that the same situation occurs here and that the statutory criteria for modifying a guardianship, which are derived from the **Bergeron v. Bergeron**, 492 So.2d 1193 (La. 1986) standard for modifying considered decrees, diminish the constitutional rights of parents and lead to absurd consequences.

Kodie's reliance on our ruling in **Tracie F.** is misplaced. **Tracie F.** involved a dispute between a parent and non-parent who shared joint custody arising from a consent decree. The present action involves a guardianship. The proceeding originated in Mississippi, in the Jackson County Youth Court, after the Mississippi Department of Human Services had assumed legal and physical custody of L.M.M. The guardianship order found it necessary to appoint a guardian for L.M.M. because the child was removed from the custody of his natural parents. Sole custody of L.M.M. was awarded to Lisa. Thus, this is not, as in **Tracie F.**, a situation wherein a parent seeks to *expand* existing custodial rights, but rather one in which the parent is seeking to *regain* such rights. As this court made clear, in **Tracie F.**, we were "not presented with a custody contest between a biological parent who has voluntarily relinquished custody or whose parental rights have otherwise been terminated; such a contest represents a separate class of cases." **Tracie F.**, 15-1812 at 21, 188 So.3d at 246.

It is true, as Kodie argues, that biological parents have constitutionally protected rights regarding their children. The Fourteenth Amendment to the United States Constitution protects a biological parent's due process right to "the companionship, care, custody and management" of his or her child, **Santosky v. Kramer**, 455 U.S. 745, 758-759 (1982), as does the Louisiana Constitution. See **In re Adoption of B.G.S.**, 556 So.2d 545, 552 (La. 1990) ("[W]e believe that the

interest of a biological parent in having an opportunity to establish a relationship with his child is one of those liberties of which no person may be deprived without due process of law under our state constitution.") Unless and until the relationship of parent and child is lawfully terminated, parents retain parental rights, even under circumstances in which they may have lost parental power.

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

**Santosky**, 455 U.S. at 753-54.

For these reasons, if the law did not afford a rehabilitated parent of a child under a guardianship any opportunity at all to revisit the question of a guardianship and thereby regain some of his or her parental power, it would raise serious constitutional questions. A plain reading of the provisions of La. Ch.C. art. 724 demonstrates, however, that the law does not have that effect.

As set forth in La. Ch.C. art. 718(B), the purpose of guardianship is two-fold. It is intended "to ensure that the fundamental needs of children are met," by, among other matters, fostering "stability and permanence in the lives of children who have been adjudicated to be in need of care and have been removed from the custody of their parent" while at the same time ensuring that "the constitutional rights of all parties are recognized and enforced." The statutory scheme honors both by imposing a test for modification that, while stringent, does not permanently deny a rehabilitated

18

parent the opportunity to alter a custodial arrangement; neither does it undermine the best interest of the child determination, as Kodie alleges.

Admittedly, La. Ch.C. art. 724(D) provides that those who seek to change or modify a guardianship must prove "a substantial and material change in the circumstances of the guardian or child," without specifically referencing the circumstances of the parent. As the Official Revision Comments to La. Ch.C. art. 724 explain:

> Paragraph D reflects the policy that the most important feature of a guardianship was its permanence during the child's minority; therefore, the standard for modification or termination ought to be quite stringent, except where the guardian seeks termination or modification. Thus, the material change must occur in the circumstances of the guardian or child. [Emphasis added.]

La. Ch.C. art. 724, Comments–2011(c).[7]

This is not to imply that the circumstances of the parent are irrelevant under La. Ch.C. art. 724(D). While improvement of a parent's capabilities will not satisfy the requirement of proving a change in circumstances of the guardian, under La. Ch.C. art. 724(D)(2), a "substantial and material change in the circumstances of the ... child" can be proved in either of two ways. Specifically, a parent can show either that "'[c]ontinuation of the guardianship is so deleterious to the child as to justify a modification or termination of the relationship or the harm likely to be caused from a change in the guardianship is substantially outweighed by the advantages to the child of the modification." La. Ch.C. art. 724(D)(2); *Id.*

In this instance, Kodie's drug rehabilitation and the stable environment she has established undoubtedly constitute an "advantage" to L.M.M. within the meaning of

---

[7] While the Official Comments are not the law, they may be helpful in determining legislative intent. **Traci F.**, 15-1812 at 8, 188 So.3d at 238 (quoting **Arabie v. CITGO Petroleum Corp.**, 10-2605, pp.4-5 (La. 3/13/12), 89 So.3d 307, 312).

the latter phrase. Such a conclusion is rooted in the reality that L.M.M. now has a secure and welcoming home with his own room where he can visit Kodie and in the ordinary legal arrangement, recognizing children belong in the care and custody of their parents. See, e.g., La. C.C. art. 133, (the language of which is described as "giving effect to a parent's paramount right to custody of his child as against any nonparent." Revision Comments–1993 (b)). Considering the ordinary preference under the law favoring parental custody, it follows that the rehabilitation and subsequent fitness of a parent from whose custody the child has previously been removed is an "advantage" that may amount to a "material change in the circumstances of the ... child" within the meaning of La. Ch.C. art. 724(D) sufficient to warrant modification or termination of a guardianship, *provided* there is proof, by clear and convincing evidence, that the advantages to the child from the parent's self-improvement "substantially" outweigh the presumed harm from changing the guardianship.

A plain reading of the provisions of La Ch.C. art. 724(D) reveals that the article does not, as Kodie alleges, "permanently den[y] a parent the opportunity to alter a custodial arrangement." What the article does is to make the requirements for modification "stringent," a burden that does not undermine the best interest of the child determination, but that is imposed "as a means of implementing the best interest standard in light of the special considerations present in change of custody cases." La. C.C. art. 131, Revision Comments–1993 (d) (discussing the **Bergeron** standard for modifying custody in considered decrees that has been adopted by the legislature in La. Ch.C. art. 724(D)(2); see Official Comment (c) to La. Ch.C. art. 724).

Moreover, the article does not contemplate that a different evidentiary standard for modifying or terminating a guardianship should apply where the parents consent

20

to the guardianship, as Kodie and Lane did in this case. Indeed, La. Ch.C. art. 720(A) gives parents standing to move for (and thereby consent to) the guardianship, which is authorized only after a child has been removed from the custody of his or her parents and has been adjudicated to be in need of care. The guardianship thus bears none of the hallmarks of a stipulated judgment, wherein the parties consent to a custodial arrangement and there is no evidence required regarding parental fitness.[8]

Having determined that the statutory criteria of La. Ch.C. art. 724(D) supply the relevant legal standard for determining whether the guardianship of L.M.M. should be terminated and that interpretation of those criteria require no jurisprudential modification, we next examine Kodie's alternative argument, that she met her burden of proof under La. Ch.C. art. 724(D)(2).[9]

Before examining the evidentiary record, it is necessary to determine the appropriate standard of review to be applied to the district court's judgment. Based on the district court's statement that her findings of fact were issued pursuant to La. Ch.C. art. 724, the court of appeal applied an abuse of discretion standard of review to the district court's judgment. **In re: L.M.M., Jr.**, 17-345 at 15, 230 So.3d at 310. However, a review of the court's written reasons reveals that, in reaching the conclusion that the guardianship should be terminated, the district court recited

---

[8] To the extent that Kodie complains that the guardianship in this case does not "fit into the pattern of a guardianship" because "the guardianship was not the result of a trial resulting in a determination of parental unfitness," her complaint of a formal defect in the Mississippi proceeding was waived when she failed to appeal the order, allowing it to become a final judgment. See La. C.C.P. art. 1841. Further, by moving to have the guardianship order made executory in Louisiana, Kodie acquiesced in that Mississippi judgment. See La. C.C.P. art. 2003 ("A defendant who voluntarily acquiesced in the judgment, or who was present in the parish at the time of its execution and did not attempt to enjoin its enforcement, may not annul the judgment on any of the ground enumerated in Article 2002.").

[9] La. Ch.C. art. 724(D)(1) has no relevance in this matter as a ground for modification or termination of the guardianship as Lisa testified that she is both willing and able to continue as L.M.M.'s guardian.

considerations that are irrelevant to the instant proceeding[10] for reasons previously explained[11] and that, while reflecting on circumstances surrounding the confection of the guardianship,[12] are not germane to the issue presented: whether Kodie presented proof by clear and convincing evidence of a material and substantial change in the circumstances of L.M.M. because either (1) continuation of the guardianship is so deleterious to L.M.M. as to justify its termination or (2) the harm likely to be caused from termination of the guardianship is substantially outweighed by the advantages to L.M.M. of that termination. While indicating that consideration was given to the custody evaluation reports, the best interest of the child, and Kodie's improved circumstances, the district court's reasons do not reflect that this evidence was viewed through the lens of the stringent standards for modification of guardianship orders required by La. Ch.C. art. 724. Because the district court's reasons do not reflect that the court considered the relevant legal standards in reaching its judgment and that the court considered extraneous factors in rendering its decision, we find that the court committed legal error in its analysis, warranting *de novo* review. See, e.g., **Bridges v. Nelson Indus. Steam Co.**, 15-1439, p. 4 (La. 5/3/16), 190 So.3d 276, 279 (where the district court's reasons for ruling reveal an error in the legal analysis, *de novo* review is required).

Pursuant to La. Ch.C. art. 724(D)(2) Kodie's burden in this case is to prove, by clear and convincing evidence,[13] that there has been a material and substantial change

---

[10] The district court found among the "salient" facts that the original guardianship proceeding did not comply with La. Ch.C. arts. 720(B), 722(A)(2) and 722(C).

[11] See n.9, *supra*.

[12] The district court additionally found as "salient" that Kodie was told to sign the guardianship papers or give up her child for good and that Kodie thought she would have visitation and eventually have her child returned to her.

[13] "Clear and convincing" evidence requires more than a "preponderance," but less than "beyond a reasonable doubt." See e.g., **Louisiana State Bar Association v. Edwins**, 329 So.2d 437, 442

22

in circumstances of L.M.M. because either (1) continuation of the guardianship is so deleterious to L.M.M. as to justify its termination or (2) the harm likely to be caused from a change in the guardianship is substantially outweighed by the advantages to the child.

With respect to the first situation, Kodie argues that the continuation of a guardianship which denies her any significant contact with her son and denies her the right to have input into medical or educational decisions affecting L.M.M. is "so deleterious" to L.M.M. as to warrant termination of the guardianship. As support for this argument, she points to the testimony of Dr. Van Beyer, who found fault with Lisa's guardianship in the following respects: (1) Lisa restricts Kodie's access to L.M.M. and does not allow her to participate in educational and medical decisions; (2) Lisa indulges the child and allows him to sleep with her when he is upset; and (3) Lisa has had difficulties with the child having temper tantrums that others have not reported experiencing.

As to the first criticism, Lisa's limiting Kodie's access to L.M.M., this criticism is directed not to any change in the circumstances of L.M.M., but derives from Kodie's changed circumstances: her rehabilitation and the self-improvements that have led her to seek greater involvement in L.M.M.'s life. As Comment–2011(c) of the Official Comments to La. Ch.C. art. 724 explains, however, "[i]mprovement of a parent's capabilities ... would not satisfy the threshold requirement that some deterioration in the quality of the guardian's care must be demonstrated." Furthermore, implicit in the requirement that continuation of the guardianship be "deleterious" to the child is that there be some showing of a deterioration in the

_____

(La. 1976). Under the "clear and convincing" standard, the existence of the disputed fact must be highly probable or much more probable than its nonexistence. *Id.*

guardian's care. No such showing appears in the record of this case. To the contrary, the record reflects that Lisa's guardianship has greatly benefitted L.M.M., a fact that Kodie acknowledged.[14]

The evidence establishes that once she obtained guardianship of L.M.M., Lisa was instrumental in re-enrolling him in the First Steps program and in securing the medical and therapeutic services he required. Lisa has consistently taken L.M.M. to physical therapy and to medical and dental appointments, and has enrolled him in gymnastics to assist with his balance. She has also paid for his enrollment in private daycare, where the director reports that he has progressed physically, mentally, and emotionally. Indeed, Dr. Van Beyer testified that Lisa has been both determined and avid in her pursuit of the medical attention L.M.M. requires, so much so that by the time Dr. Van Beyer met, L.M.M., "he had caught up, he was not any longer really behind." Further, while Dr. Van Beyer opined that Lisa should have made every effort to consult Kodie about L.M.M.'s medical condition and to include her in therapy and medical appointments, Dr. Van Beyer also testified that she had no concern (unlike Kodie) that Lisa had overstated L.M.M.'s medical needs. Given Kodie's testimony that she does not believe that L.M.M. has cerebral palsy, it can hardly be said that Kodie has demonstrated that Lisa's actions in not seeking her advice were "so deleterious" to L.M.M. as to warrant a change in the guardianship.

As to Dr. Van Beyer's concern that L.M.M. has tantrums with Lisa that no one else has experienced, it appears that Lisa reported to Dr. Van Beyer that L.M.M. is resistant to change and that he will have a tantrum if he has to alter his routine. While Dr. Van Beyer was not aware of this occurring with his mother and expressed concern

---

[14] Kodie admitted at trial that Lisa's care of L.M.M. benefitted him at a time when neither of his parents was in a position to provide what was best for him.

that L.M.M. only reacted this way with Lisa, Kodie admitted at trial that L.M.M. behaves similarly with her. She testified that L.M.M. is a child "who gets used to where he is at the time." According to Kodie, when L.M.M. has to leave her, "he cries and throws fits and screams and doesn't want to leave." Thus, it appears Dr. Van Beyer's concerns were based on an incomplete understanding of the facts.

In the final analysis, Dr. Van Beyer's criticisms of Lisa simply do not rise to the level of clear and convincing evidence that continuation of the guardianship is "so deleterious" to L.M.M. as to require its termination. By all accounts, Lisa has worked to improve L.M.M.'s health and has provided him with a stable home environment and an enriching education, and the evidence suggests that she will continue to do so. Significantly, the record does not support a finding that there has been any deterioration in the quality of Lisa's care of L.M.M.

With respect to the second factor which requires the showing of a substantial and material change in the circumstances of the child, *i.e.,* when the harm likely to be caused from a change in the guardianship is substantially outweighed by the advantages to the child of the modification, Kodie argues that the record demonstrates that the advantages to L.M.M. of being reared by his mother substantially outweigh any harm likely to result from termination of the guardianship. In support of this argument, Kodie cites to her rehabilitation and greatly improved circumstances. She also relies on the recommendations of the two experts witnesses, Dr. Van Beyer and Dr. Klein, that Kodie share joint custody with Lisa with Kodie as the domiciliary custodian.

The record in this case establishes, and no one disputes, that Kodie has made significant strides, turning her life around. For that, she is to be commended. It is also clear that L.M.M. has benefitted from having his mother in his life in that he has

formed a strong attachment to her. The burden Kodie faces in seeking modification of the guardianship, however, is to demonstrate, clearly and convincingly, that the advantages gained from her self-improvement "substantially outweigh" the harm likely to result from removing L.M.M. from Lisa's guardianship.

In this regard, it bears repetition that the evidence establishes that Lisa's guardianship has been greatly beneficial to L.M.M. Since his birth, even predating the guardianship, Lisa has been a consistent presence in L.M.M.'s life, providing care, shelter, and support. In fact, with the exception of the four to five-month period during which L.M.M. was living in Mississippi and in foster care, the child has lived in the same room in Lisa's home. Once she obtained guardianship, Lisa invested considerable time, energy, and finances in ensuring that L.M.M. had available all the resources he required to thrive, physically and emotionally. Dr. Klein noted that L.M.M. has a significant attachment to Lisa and that she has become a "psychological parent" to the child. He opined that to terminate or severely limit this relationship would cause "immeasurable harm" to L.M.M. Finally, Lisa expressed concern that if the guardianship were terminated, Kodie would not follow through with L.M.M.'s medical needs, as Kodie does not accept Dr. Karlin's cerebral palsy diagnosis "to the extent that it's being pushed," a concern on Lisa's part that does not appear unreasonable in light of Kodie's acknowledged rejection of that diagnosis.

Balanced against this evidence is the testimony of the custody evaluators, Drs. Van Beyer and Klein. Admittedly, both experts recommended a joint custody arrangement with Kodie as domiciliary parent. Kodie relies heavily on these recommendations in arguing that she sustained her burden of proof. However, there is no indication that the experts evaluated the situation in light of the stringent

requirements of La. Ch.C. art. 724.[15]  Their testimonies and recommendations do not address whether the harm likely to be caused from a change in the guardianship is substantially outweighed by the advantages to L.M.M. of the modification. Yet, this was the burden Kodie was required to meet.  On the present record, Kodie has simply failed to produce sufficient evidence from which we can discern that any advantage to L.M.M. gained from her self-improvement substantially outweighs the harm that would likely result from terminating the guardianship.

This conclusion is bolstered when the purpose of guardianship is considered. La. Ch.C. art. 718(A).  In making the requirements for modification of guardianships stringent, the legislature has made a policy decision about the benefits of stability in children's lives that is consistent with this court's pronouncements in **Bergeron**: "The child has at stake an interest of transcending value in a custody modification suit–his best interest and welfare–which may be irreparably damaged, not only by a mistaken change in custody, but also by the effects of an attempted or threatened change of custody on grounds that are less than imperative." **Bergeron**, 492 So.2d at 1200.  In the final analysis, the evidence offered by Kodie fails to convince us that this is the narrow case in which the benefits to the child from a modification of custody are "so great that they clearly and substantially outweigh any harm that will be likely to result from the change even though the present custody is not deleterious to the child." ***Id.***

## CONCLUSION

As previously noted, guardianship is a custody regime that has been relatively recently introduced in Louisiana law.  It is intended to be a permanent placement for children when neither reunification with a parent nor adoption has been found to be

---

[15] In fact, Dr. Klein's report indicates that, in making his recommendation, he considered the factors set out in La. C.C. art. 134 for determining the child's best interest.

in their best interest, although it is not immutable. Louisiana Ch.C. art. 724(D) sets forth the requirements for modifying or terminating a guardianship. Those requirements apply here. A *de novo* review of the evidence presented in this case reveals that the district court erred in determining that Kodie met her stringent burden of proving the guardianship should be terminated. The evidence fails to establish a substantial and material change in the circumstances of the child on either of the grounds set forth in La. Ch.C. art. 724(D)(2). The record simply does not support a finding that there has been a deterioration in the quality of Lisa's care such that continuation of the guardianship is so deleterious to the child as to justify termination of the guardianship. Further, while Kodie's self-improvement is admirable, it alone is not sufficient to establish that the harm likely to be caused by a change in the guardianship is substantially outweighed by the advantages to the child of the modification. We therefore affirm the decision of the court of appeal to reverse the district court judgment and reinstate the guardianship, and remand this matter to the district court for the purpose of setting a visitation schedule for Kodie, consistent with the court of appeal's direction.[16]

     **AFFIRMED AND REMANDED**.

---

[16] As Lisa did not seek a writ challenging the ruling of the appellate court, we leave that aspect of the appellate court decision intact.

28

06/27/18

SUPREME COURT OF LOUISIANA

No. 2017-CJ-1988

IN RE:  L.M.M., JR., A MINOR

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, FIFTH
CIRCUIT, PARISH OF JEFFERSON

**Hughes, J., dissenting.**

"Courts should look through the caption of pleadings in order to ascertain their substance and to do substantial justice." *Smith v Cajun Insulation,* 392 So.2d 398, 402 (La. 1980).  Substantial justice has not been done in this case.  This court has previously rejected an attempt to convert a custody judgment into a guardianship governed by the Louisiana Children's Code.  *See George v Dugas*, 203 So.3d 1043 (La. 2016).  Unfortunately, the opinion in the present case succeeds in doing so on an even shakier foundation.

Guardianship is a type of "super custody", which is very difficult to modify once established, lasting until a child is eighteen, thus making reunification between a parent and child extremely difficult.

The preamble of the Children's Code, Art. 101, provides that preserving families is essential to a free society and that the relationship between parent and child is preeminent in establishing and maintaining the wellbeing of the child. Because of the "permanent" nature of guardianship under Louisiana law, it is especially important that its requirements be recognized and honored, especially by courts on review.

To achieve guardianship in Louisiana there must be two separate adjudications.  First, there must be a finding that the child is in need of care.  A Child in Need of Care proceeding may only be initiated by the District Attorney,

by verified petition. The parents must answer, and then a timely adjudication hearing must be held. Only after a child has been adjudicated a child in need of care may a motion for guardianship be filed. Art. 720 provides the requirements for the motion. Pursuant to Art. 722, a hearing shall be held where the mover must prove by clear and convincing evidence that, among other things, reunification with a parent is not in the best interest of the child. The court is required to enter a written order that includes findings upon which the order is based.

In its haste to impose the more onerous burden of proof and standard of review of guardianship on the ruling of the trial court in favor of the child's mother, the opinion fails to discuss these prerequisites of guardianship, possibly because they are simply not present. Rather, the basis for imposing Louisiana guardianship law in this case is a judgment from Mississippi. Although the judgment refers to a "Guardian", it bears little resemblance to Louisiana guardianship. "Letters of Guardianship" are ordered, it speaks to the "child's estate," and provides that the Guardian will serve "without bond and is hereby excused from filing annual accountings." It is clear that Mississippi law in this matter is the common law equivalent of tutorship in Louisiana. The judgment was entered into by consent and is not a "considered decree." None of the requirements of the Children's Code have been met, as recognized by the trial court, but nonetheless the Mississippi judgment is bootstrapped into the equivalent of Louisiana guardianship, a much different animal, simply because it contains the word "guardian," with no analysis of its underpinnings, thus elevating form over substance to an absurd level.

In creating a Louisiana guardianship with the strictures of the Children's Code when there has been no adjudication of a child in need of care and when there has been no guardianship hearing with clear and convincing proof that

2

reunification is not in the best interest of the child, this court infringes on the constitutional and due process rights of the parent and child as recognized by the United States Supreme Court in *Santosky v Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982) and this court in *State in re J.M., J.P.M., and M.M.*, 837 So.2d 1247 (La. 2003).

The trial court recognized the shortcomings of the Mississippi judgment, considered the best interest of the minor child, and "terminated" the Mississippi guardianship. The court of appeal and this court rule that "best interest of the child" no longer applies, accepting at face value the Mississippi guardianship, with no analysis of its substance.

Louisiana has fact pleading. It is the duty of the courts to discern and apply the law to the facts. Justice Clark, writing for this court, in *Wooley v Lucksinger*, 09-0571, pp. 49, 62-62 (La. 4/1/11), 61 So.3d 507, 554, 562-63 (emphasis added), stated:

> The Louisiana Constitution provides that the appellate jurisdiction of a court of appeal in a civil matter extends to both law and facts. La. Const. 1974, art. 5, § 10(B). Questions of law are reviewed de novo, with the judgment rendered "on the record, without deference to the legal conclusions of the tribunals below." *Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc.*, 2006-0582 p. 9 (La. 11/29/06), 943 So.2d 1037, 1045; citing *Louisiana Municipal Association v. State*, 2004-0227 p. 35 (La. 1/19/05), 893 So.2d 809, 836.
>
> * * *
>
> At the outset, we note *the absence of an assignment of error* or lack of objection to the district court's choice of law ruling by a litigant *would not prevent the court of appeal from raising this issue*. Without doubt, *an appellate court has the authority to raise an issue sua sponte on appeal*. The state constitution authorizes the appellate jurisdiction of a court of appeal in civil matters to extend to law and facts. La. Const. art. 5, § 10(A) and (B). La. C.C.P. art. 2129 specifically provides: "[a]n assignment of error is not necessary in any appeal." La. C.C.P. art. 2164 provides an appellate court "shall render any judgment which is just, legal, and proper upon the record on appeal."

3

The best interest of the child in this case may be debatable, but the requirements of the Children's Code are not. If the majority truly believes the Mississippi judgment has been transformed into full-fledged Louisiana guardianship, this court should vacate the trial court judgment and remand this matter to the Jefferson Parish Juvenile Court, which has original exclusive jurisdiction over Child in Need of Care proceedings pursuant to Title VI of the Children's Code, including Chapter 19 (Guardianship). *See* LSA-Ch.C. Art. 302 and 303. In this is a Louisiana guardianship, the 24th Judicial District Court has no jurisdiction to hear this matter. Jurisdiction cannot be waived by consent and should be raised sua sponte on review.

As noted by Judge (now Justice) Weimer in *Bordelon v Dehnert*, 770 So.2d 433 (La. App. 1st Cir. 2000):

> Subject matter jurisdiction is a threshold issue because a judgment rendered by a court which has no jurisdiction over the subject matter of the action or proceeding is **void**. *See* LSA–C.C.P. art. 3. Jurisdiction over the subject matter is the legal power and authority of a court to hear and determine a particular class of actions or proceedings, based upon the object of the demand, the amount in dispute, or the value of the right asserted. LSA–C.C.P. art. 2. Subject matter jurisdiction cannot be waived by the parties and the lack thereof can be recognized by the court at any time, with or without formal exception. LSA–C.C.P. arts. 3 and 925. (Emphasis added.)

4